JUDGE SCHEINDLIN

14 CV   2994

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------x

PATRICIO JIMENEZ and MARIBEL GONZALEZ-
MOSSO JIMENEZ,

                              Plaintiff,

           -against-

THE CITY OF NEW YORK; DETECTIVE JAMES
QUILTY; NEW YORK CITY HEALTH AND
HOSPITALS CORPORATION; HARLEM HOSPITAL
CENTER; KRYSTAL MERRITT; HANNA COHEN,
CYRACOM INTERNATIONAL, INC.; THE MOUNT
SINAI HOSPITAL; MOUNT SINAI HOSPITALS
GROUP, INC.; REYNOLD TROWERS; and JOHN/JANE
DOE # 1 - 3,

                          Defendants.

--------------------------------------------------------------------------x

**COMPLAINT**

**JURY TRIAL DEMANDED**

RECEIVED
APR 28 2014
U.S.D.C. S.D.N.Y.
CASHIERS

## NATURE OF THE ACTION

1.      This is an action to recover money damages arising out of the violation of Plaintiffs'

rights under the Constitution of the United States.

## JURISDICTION AND VENUE

2.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth,

Fifth, and Fourteenth Amendments to the Constitution of the United States.

3.      The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343, and

1367(a).

4.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## JURY DEMAND

5.      Plaintiffs demand a trial by jury in this action.

PARTIES

6.      Plaintiff Patricio Jimenez ("Mr. Jimenez") is a resident of the County of New York, State of New York.

7.      Plaintiff Maribel Gonzalez-Mosso Jimenez ("Mrs. Jimenez") is a resident of the County of New York, State of New York.

8.      Mr. and Mrs. Jimenez do not speak English, with Spanish being their native language.

9.      Defendant The City of New York is a municipal organization organized under the laws of the State of New York.

10.     Defendant The City of New York operates the New York City Police Department ("NYPD"), a department or agency of Defendant The City of New York.

11.     The NYPD is responsible for the appointment, training, supervision, promotion, and discipline of police officers and supervisory police officers, including the individually named defendants herein.

12.     At all times relevant herein, Defendant Detective James Quilty ("Quilty") was an officer, employee, and agent of Defendant The City of New York.

13.     At all times relevant herein, Defendant Quilty was acting within the scope of his employment with Defendant The City of New York.

14.     At all times relevant herein, Defendant Quilty was acting under color of state law.

15.     Defendant Quilty is sued in his individual and official capacities.

16.     Defendant New York City Health and Hospitals Corporation ("NYCHHC") is a public benefit corporation organized under the laws of the State of New York.

17.     At all times relevant herein, Defendant Harlem Hospital Center was a hospital owned, directed, and controlled by Defendant NYCHHC.

18.     At all times relevant herein, Defendant Krystal Merritt ("Merritt") was an employee and agent of Defendants NYCHHC and Harlem Hospital Center.

19.     At all times relevant herein, Defendant Merritt was acting within the scope of her employment with Defendants NYCHHC and Harlem Hospital Center.

20.     At all times relevant herein, Defendant Merritt was acting under color of state law.

21.     Defendant Merritt is sued in her individual and official capacities.

22.     At all times relevant herein, Defendant Reynold Trowers ("Trowers") was an employee and agent of Defendants NYCHHC and Harlem Hospital Center.

23.     At all times relevant herein, Defendant Trowers was acting within the scope of his employment with Defendants NYCHHC and Harlem Hospital Center.

24.     At all times relevant herein, Defendant Trowers was acting under color of state law.

25.     Defendant Trowers is sued in his individual and official capacities.

26.     Defendant Mount Sinai Hospitals Group, Inc. ("MSHG") is a domestic not-for-profit corporation organized under the laws of the State of New York.

27.     At all times relevant herein, Defendant The Mount Sinai Hospital ("MSH") was a hospital owned directed and controlled by Defendant MSHG.

28.     At all times relevant herein, Defendant Hanna Cohen ("Cohen") was an agent and employee of Defendants MSHG and MSH.

29.     At all times relevant herein, Defendant Cohen was acting within the scope of her employment with Defendants MSHG and MSH.

30.     At all times relevant herein, Defendant Cohen was acting under color of state law.

31.     Defendant Cohen is sued in her individual and official capacities.

32.     Defendant Cyracom International, Inc. ("Cyracom") is a foreign business corporation authorized to do business in the State of New York.

33.     At all times relevant herein, Defendant John/Jane Doe # 1 ("Cyracom Agent") was an employee and agent of Defendant Cyracom.

34.     Defendant Cyracom Agent, whose first name is Elizabeth, was assigned the agent number "660571" by Defendant Cyracom.

35.     At all times relevant herein, Defendant Cyracom Agent was acting within the scope of her employment with Defendant Cyracom.

36.     Defendant Cyracom Agent is sued in her individual and official capacities.

37.     At all times relevant herein, Defendants John/Jane Doe # 2 - 10 were supervisors, officers, employees, and/or agents of Defendant The City of New York.

38.     At all times relevant herein, Defendants John/Jane Doe # 2 - 10 were acting within the scope of their employment with Defendant The City of New York.

39.     At all times relevant herein, Defendants John/Jane Doe # 1 - 10 were acting under color of state law.

40.     Defendants John/Jane Doe # 1 - 10 are sued in their individual and official capacities.

41.     The names John/Jane Doe # 1 - 10 are fictitious, their true names being unknown to Plaintiffs at this time.

STATEMENT OF FACTS

42.     On December 26, 2012, Mrs. Jimenez was at home when she became dizzy and fell in the bathroom in her home, and was unable to stand.

43.     Her daughter, Marian Jimenez, who at the time was 11 years old, called 911 and requested an ambulance for her sick mother.

44.     Upon arriving at the home, EMS began questioning Mrs. Jimenez, repeatedly asking her in English if she had been physically abused by her husband.  Mrs. Jimenez's daughter Marian, able to speak English, translated for her mother, and repeatedly told the EMS workers, on her mother's behalf, that her father had not hit her mother, and that she had simply fallen in the bathroom.

45.     The EMS workers transported Mrs. Jimenez to Harlem Hospital's emergency room via ambulance.

46.     Once there, EMS workers falsely reported to the hospital staff that Mrs. Jimenez was the victim of domestic abuse.

47.     Testing at Harlem Hospital revealed that Mr. Jimenez was hyperglycemic and diabetic.

48.     An examination also revealed that Mrs. Jimenez had no injuries, bruises, abrasions, or lacerations to any part of her body.

49.     Mrs. Jimenez was attended by Defendant Trowers, a doctor with Harlem Hospital; Defendant Merritt, a social worker with Defendants NYCHHC and Harlem Hospital; and Defendant Cohen, a representative of the Mount Sinai Sexual Assault and Violence Intervention Program (collectively "Hospital Defendants").

50.     Defendant Merritt attempted to speak with Mrs. Jimenez, but they could not communicate as Defendant Merritt did not speak Spanish.

51.     As none of the Hospital Defendants were fluent in Spanish, Defendant Cyracom Agent was employed as an interpreter between the defendants and Mrs. Jimenez.

52.     Through Defendant Cyracom Agent, Mrs. Jimenez informed the Hospital Defendants that she had become dizzy and had fallen in her bathroom.

53.     Mrs. Jimenez said that she did not know the medical cause of the fall.

54.     The Hospital Defendants informed Mrs. Jimenez through Defendant Cyracom Agent that she had diabetes and was suffering symptoms of hyperglycemia.

55.     Mrs. Jimenez informed Defendant Trowers through Defendant Cyracom Agent that she did not know that she was diabetic and had not been taking any medication to regulate her blood sugar.

56.     This discussion with Mrs. Jimenez lasted about two minutes.

57.     At no time did the Hospital Defendants or Defendant Cyracom Agent ask Mrs. Jimenez if she had been the victim of domestic violence.

58.     Despite knowing that Mrs. Jimenez had no physical injuries, that Mrs. Jimenez reported no physical abuse, and that she was a diabetic experiencing symptoms of hyperglycemia, Defendants Trowers, Cohen, Merritt, and Cyracom agent conspired together, creating false records for and statements by Mrs. Jimenez, stating, *inter alia*, that she had reported she had been physically abused by her husband, Mr. Jimenez.

59.     At the time that they created these records and allegations, the Hospital Defendants and Defendant Cyracom Agent knew the allegations to be false.

60.     Hospital Defendants went further, calling members of the NYPD to the hospital, where they filled out various documents alleging that Mrs. Jimenez had been the victim of domestic violence at the hands of her husband.

61.     These members of the NYPD did not attempt to speak with Mrs. Jimenez about the false allegations.

62.     Instead, the members of the NYPD supplied the false report to Defendant Quilty and other members of the NYPD.

63.     Mrs. Jimenez was release from Harlem Hospital approximately seven hours after she arrived at its emergency room.

64.     After Mrs. Jimenez left Harlem Hospital, the Hospital Defendants continued to follow up with and provide false information to members of the NYPD, including Defendant Quilty.

65.     After Mrs. Jimenez left Harlem Hospital, the Hospital Defendants continuously assisted in and encouraged the arrest and prosecution of Mr. Jimenez, despite knowing the allegations against him to be false.

66.     Upon information and belief, Defendant Quilty conferred with the Hospital Defendants as well as their co-workers, and, through them, obtained the same information that the Hospital Defendants had.

67.     Despite knowing that Mrs. Jimenez had no injuries to her body; that she had become dizzy and fallen in her bathroom; and that she suffered from diabetes and, specifically, had suffered from the symptoms of hyperglycemia on December 26, 2012, Defendant Quilty and his partner took steps to arrest Mr. Jimenez for domestic abuse.

68.     Approximately 2 weeks after December 26, 2012, Defendant Quilty and his partner, who spoke Spanish, went to Mrs. Jimenez's home.

69.     While there, Defendant Quilty's partner spoke with Mrs. Jimenez in Spanish.

70.     Mrs. Jimenez told him repeatedly that she had not been abused by her husband. Mrs. Jimenez explained that she had fallen in her bathroom after becoming dizzy.

71.     She further informed Defendant Quilty's partner that the Hospital Defendants had informed her that she has diabetes, and that she had become dizzy and fallen because she had not been regulating her blood sugar with medication.

72.     Defendant Quilty's partner conveyed all of this information to Defendant Quilty.

73.     Despite this information, Defendant Quilty and his partner demanded Mrs. Jimenez give them Mr. Jimenez's work address.

74.     Approximately one week later, Detective Quilty and his partner went back to Mrs. Jimenez's home.

75.     While there, they told Mrs. Jimenez they would report Mr. Jimenez to immigration officials if he did not turn himself in.

76.     Mrs. Jimenez again told Defendant Quilty and his partner that Mr. Jimenez had not abused her, and that she had fallen in her bathroom as a result of being hyperglycemic and suffering from diabetes.

77.     After learning of this threat, Mr. Jimenez attempted to turn himself in at the police precinct.

78.     Once there, he was told to come back as Defendant Quilty was not there.

79.     Approximately one week later on January 30, 2013, Mr. Jimenez again appeared at the police precinct with his wife, where he was placed under arrest by Defendant Quilty and his partner.

80.     Mr. Jimenez's arrest was without probable cause.

81.     Mr. Jimenez's arrest was approved by Defendant Quilty's supervisor.

82.     The individual defendants spoke with the New York County District Attorneys' Office, individually and collectively lying to the New York County District Attorney's Office that Mr. Jimenez had violated New York Penal Law §§ 120.00(2), 120.00(1), 110/120.00(1), and 240.26(1).

83.     Defendant Quilty lied further to the New York County District Attorney's Office, telling prosecutors that Mrs. Jimenez had told him directly that she was the victim of abuse at the hands of her husband.

84.     Based on these fabricated allegations, the New York County District Attorney's Office forwarded to Defendant Quilty a Criminal Court Complaint.

85.     The Criminal Court Complaint was reviewed and then signed by Defendant Quilty.

86.     When reviewing and signing the Criminal Court Complaint, Defendant Quilty knew the allegations contained therein to be false.

87.     The executed Criminal Court Complaint was then forwarded by Defendant Quilty to the New York County District Attorney's Office.

88.     Legal process was issued against Mr. Jimenez, and Mr. Jimenez was booked, processed, and arraigned.

89.     At his arraignment, Mr. Jimenez was ordered held on an immigration detainer, as a result of an alert sent by Detective Quilty and his partner which falsely set forth that Mr. Jimenez had committed crimes for which he could be detained.

90.     During the pendency of the criminal proceeding, the individual defendants forwarded false evidence to the New York County District Attorney's Office, *inter alia*, arrest reports, complaint reports, false statements, and property vouchers, and purposefully withheld information from the New York County District Attorney's Office.

91.     On March 7, 2013, the false charges against Mr. Jimenez were dismissed by the Court after a motion to dismiss the charges was presented by the New York County District Attorney's Office.

92.     On March 8, 2013, the immigration detainer was lifted against Mr. Jimenez.

93.     As a result of the false charges, and the fulfilled promise by Detective Quilty and his partner to report the false charges to immigration, Mr. Jimenez was held in custody from January 30, 2013, until March 8, 2013.

94.     Mr. Jimenez and Mrs. Jimenez suffered damage as a result of Defendants' actions. Mr. Jimenez was, *inter alia*, deprived of liberty, suffered emotional distress, physical injury, mental anguish, fear, pain, anxiety, embarrassment, humiliation, and damage to reputation.  Mrs. Jimenez, inter alia, suffered emotional distress, loss of consortium, mental anguish, fear, anxiety, embarrassment, and humiliation.

95.     Within ninety days of the events alleged herein, a Notice of Claim was served on Defendants The City of New York and NYCHHC.

96.     Defendants The City of New York and NYCHHC have refused or neglected to make any adjustment or payment.

### FIRST CAUSE OF ACTION
*42 U.S.C. § 1983*

97.     Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

98.     Defendants, by their conduct toward Mr. Jimenez as alleged herein, violated Mr. Jimenez's rights guaranteed by 42 U.S.C. § 1983, the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

99.     As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein alleged.

### SECOND CAUSE OF ACTION
*State & Federal Unlawful Stop and Search*

100.     Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

101.     Defendants violated the Fourth and Fourteenth Amendments because they stopped and searched Mr. Jimenez without reasonable suspicion or probable cause.

102.     As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein alleged.

### THIRD CAUSE OF ACTION
*State & Federal False Arrest*

103.     Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

104.     The individual defendants violated the Fourth and Fourteenth Amendments because they arrested and/or caused the arrest of Mr. Jimenez without probable cause.

105.     As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein alleged.

## FOURTH CAUSE OF ACTION
### *Assault, Battery, and Harassment*

106.     Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

107.     The Defendants assaulted, battered, and harassed Plaintiffs.

108.     As a result of the foregoing, Plaintiffs sustained the damages herein alleged.

## FIFTH CAUSE OF ACTION
### *Negligence*

109.     Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

110.     The Defendants were under a duty to protect Plaintiffs from injury.

111.     The Defendants breached their duty to protect Plaintiffs from injury.

112.     The Plaintiffs' injuries set forth herein were proximately caused by the Defendants' breach of their duty to protect Plaintiffs from injury.

113.     As a result of the foregoing, Plaintiffs sustained the damages herein alleged.

## SIXTH CAUSE OF ACTION
### *Intentional Infliction of Emotional Distress*

114.     Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

115.     The Defendants' extreme and outrageous conduct was committed with the intent to cause, or the disregard of a substantial likelihood of causing, sever emotional distress.

116.     The Plaintiffs' injuries set forth herein were proximately caused by the Defendants' extreme and outrageous conduct.

117.     As a result of the foregoing, Plaintiffs sustained the damages herein alleged.

SEVENTH CAUSE OF ACTION
*Negligent Infliction of Emotional Distress*

118.    Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

119.    The Defendants were under a duty to protect Plaintiffs from injury.

120.    The Defendants breached that duty, exposing Mr. Jimenez to an unreasonable risk of bodily injury, *inter alia*, being assault and battery by being falsely arrested and while in custody.

121.    This unreasonably endangered Mr. Jimenez's safety, and caused Plaintiffs to fear for Mr. Jimenez's safety.

122.    As a result of the foregoing, Plaintiffs sustained the damages herein alleged.

EIGHTH CAUSE OF ACTION
*Negligent Hiring, Supervision, and Retention*

123.    Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

124.    Defendants The City of New York, NYCHHC, Harlem Hospital, Cyracom, MSH, and MSHG knew or should have known of the individual defendants' propensity for the conduct alleged herein.

125.    Despite that knowledge, defendants The City of New York, NYCHHC, Harlem Hospital, Cyracom, MSH, and MSHG hired and retained the individual defendants as employees.

126.    Defendants The City of New York, NYCHHC, Harlem Hospital, Cyracom, MSH, and MSHG failed to take any steps to protect Plaintiffs from the individual defendants' actions alleged herein.

127.    The injuries sustained by Plaintiffs were the result of the negligent hiring, supervision, and/or retention of the individual defendants by defendants The City of New York, NYCHHC, Harlem Hospital, Cyracom, MSH, and MSHG.

128.    As a result of the foregoing, Plaintiffs sustained the damages herein alleged.

## NINTH CAUSE OF ACTION
*Denial of Substantive Due Process*

129.    Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

130.    The individual defendants created false evidence against Mr. Jimenez.

131.    The individual defendants forwarded the false evidence to prosecutors in the New York County District Attorney's Office.

132.    The individual defendants also forwarded the false evidence to prosecutors with the United States Department of Justice and the United States Immigrations and Customs Enforcement.

133.    In creating false evidence against Mr. Jimenez, and in forwarding false evidence to prosecutors, the individual defendants violated Mr. Jimenez's right to substantive due process under the Due Process Clause of the Fifth and Fourteenth Amendments of the Constitution of the United States.

134.    As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein alleged.

## TENTH CAUSE OF ACTION
*Malicious Abuse of Process*

135.    Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

136.    The individual defendants issued and/or caused to be issued legal process to place Mr. Jimenez under arrest.

137.    The individual defendants arrested Mr. Jimenez in order to obtain collateral objectives outside the legitimate ends of the legal process, *inter alia*, to protect their own financial

interests, to increase their productivity ratings, and to cover up their intolerance towards persons they believe are immigrants in this country.

138.    The individual defendants pursued these collateral objectives after issuance of legal process by, *inter alia*, forwarding false evidence to the New York County District Attorney's Office, United States Department of Justice, and United States Immigrations and Customs Enforcement, and continuing to participate in the prosecution of Mr. Jimenez.

139.    The individual defendants acted with intent to do harm to Plaintiffs without excuse or justification.

140.    As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein alleged.

<u>ELEVENTH CAUSE OF ACTION</u>
*State & Federal Malicious Prosecution*

141.    Plaintiffs repeats and realleges each and every allegation as if fully set forth herein.

142.    The individual defendants initiated the criminal proceedings against Mr. Jimenez by issuing and/or causing to be issued legal process against Mr. Jimenez.

143.    The individual defendants lacked probable cause to commence the criminal proceedings against Mr. Jimenez.

144.    The individual defendants' actions were motivated by actual malice.

145.    The criminal proceedings were terminated in favor of Mr. Jimenez.

146.    As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein alleged.

## TWELFTH CAUSE OF ACTION
*Failure to Intervene*

147.    Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

148.    Those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct; had an opportunity to prevent such conduct; had a duty to intervene and prevent such conduct; and failed to intervene.

149.    Accordingly, the defendants who failed to intervene violated the Fourth, Fifth, and Fourteenth Amendments of the Constitution of the United States.

150.    As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein alleged.

## THIRTEENTH CAUSE OF ACTION
*Conspiracy under 42 U.S.C. § 1983*

151.    Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

152.    The individual defendants jointly participated in the deprivation of Plaintiffs' constitutional rights as set forth herein.

153.    The individual defendants conspired in the deprivation of Mr. Jimenez's constitutional rights by collectively lying about Mr. Jimenez's actions and conduct; lying about Mrs. Jimenez's statements; and intentionally withholding and/or destroying exculpatory evidence in order to support the individual defendants' fabricated version of the events.

154.    As a result of the individual defendants' malicious efforts to damage Plaintiffs, Mr. Jimenez's liberty was restricted, and Mr. Jimenez was restrained, subjected to handcuffing, and, among other things, falsely arrested and prosecuted.

155.    As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages herein alleged.

FOURTEENTH CAUSE OF ACTION
*Equal Protection Clause under 42 U.S.C. § 1983*

156.    Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

157.    The Defendants' conduct was tantamount to discrimination against Plaintiffs based on their ethnicity.  This disparate treatment caused Plaintiffs to suffer serious injuries.

158.    The NYPD discriminatory program is pervasive and evident throughout many of its practices.

159.    Examples of the NYPD's discriminatory program abound.

160.    The NYPD has maintained illegal stop and question practices, as part of a systematic discriminatory program aimed towards minorities. The searches occur nearly every day without the requisite level of suspicion, and are so customary as to constitute official municipal policy.

161.    One such program is the Clean Halls Buildings program, which initially created to combat illegal activity in apartment buildings.  Many buildings are enrolled and remain in the program without regard to whether there is sustained or substantial crime.  Thus, residents and their unsuspecting guests are left subject to the unscrupulous stop, question, search, citation, and arrest practices of local NYPD officers.

162.    The impact on Blacks and Latinos as compared to Whites is disparaging and significant. From 2006 to 2010, approximately 94.4% of those stopped and questioned for trespassing were Black and Latino, although they only accounted for 52% of the New York City

population.  Blacks and Latinos were 6 times more likely to be stopped by police than Whites, Asians, and Native Americans combined.

163.   The NYPD has also maintained illegal stop and frisk policies, as part of a systematic discriminatory program aimed towards minorities.

164.   The New York State Attorney General's 1999 inquiry into the NYPD's stop and frisk program found that between the 175,000 "UF-250" stop and frisk forms filed by officers indicated consistent and significant racial skewing.

165.   According to the report, Blacks comprised 25.6% of the City's population, yet 50.6% of all persons stopped were Black.  Hispanics comprised 23.7% of the City's population yet, 33.0% of all stops were of Hispanics.  By contrast, Whites made up 43.4% of the City's population, but accounted for only 12.9% of all stops.  The disparities were further pronounced in precincts where the majority of the population was White. Where Blacks and Hispanics each represent less than 10% of the population, Blacks and Hispanics accounted for more than 50% of stops during any given period. The New York State Attorney General's finding was that 8 out of 9 searches did not uncover contraband.

166.   Under the NYPD's policy, if a person is stopped and questioned without official use of force (or with consent) and gives his or her name, documentation is not required. Consequently, NYPD officers frequently do not to file the proper UF-250 form to record stop and frisk searches.

167.   Many experts believe the numbers available from NYPD offices do not accurately reflect the discrimination of the NYPD's stop and frisk program. In one independent street

interview conducted with 100 Black and Hispanic males between the ages of 14 and 35, 81 participants reported having been stopped, patted down and questioned, without being arrested.

168.    The NYPD arrests more Blacks, Hispanics, and other minorities as compared to Whites in furtherance of its systematic discriminatory program.

169.    The NYPD frequently uses marijuana arrest cases to bolster both its productivity and arrest reports.  Marijuana possession is an infraction payable by fine in New York City, yet from 1997 to 2006, 52% Blacks, 31% Hispanics were arrested for possession of marijuana, as compared to 15% of Whites.

170.    Despite the overwhelming evidence from U.S. government surveys that have consistently shown young Whites between the ages of 18 and 25 using marijuana at higher rates than either young Hispanics and Blacks, in 2006, the marijuana arrest rate of Blacks was five times that of Whites.  The arrest rate of Hispanics in 2006 was nearly three times that of Whites.

171.    Arrest records consistently show that where minorities represent a small portion of the population, they also represent the majority of arrestees (with the exception of Staten Island). In Staten Island, Blacks were about 10% of the population, but were 37% of marijuana arrestees. In Manhattan, Blacks were about 17% of the population, but accounted for 43% of marijuana arrestees.   In Queens, Blacks were about 20% of the population, but accounted for 57% of marijuana arrestees.   In Brooklyn, Blacks were about 36% of the population, but were an overwhelming 65% of marijuana arrestees.  Finally, in the Bronx, Blacks were 36% of the population, but accounted for 48% of marijuana arrestees.  The White population and the White percentage of marijuana arrestees in each borough were equally skewed, but in the opposite direction.

172.    Trespassing and marijuana arrests are the most effective means available for obtaining fingerprints, photographs, and DNA samples (since 2006) from people never before entered in the criminal justice databases.  Where those trespassing and marijuana stops result in the issuance of a fine rather than arrest, the outcome is often still detrimental.  Often times, young persons in the housing projects (such as those enrolled in the Clean Halls Buildings program) or other poor neighborhoods do not have the means to pay the fines, and a criminal courts will issue a warrant for their arrest.  Many times, the subsequent occasion on which that person is stopped, questioned, frisked, or searched by the NYPD, the outstanding warrant will ultimately serve as a basis for arrest.

173.    As a result of the foregoing, Plaintiffs were deprived of rights under the Equal Protection Clause of the Constitution of the United States, and are thereby entitled to damages.

174.    Further, during her time at Harlem Hospital, Mrs. Jimenez was provided an interpreter for approximately two minutes out of the seven hours she was there.

175.    The refusal to provide an interpreter, especially in light of the Defendants' actions and false allegations, can be seen as nothing more than discrimination against Mrs. Jimenez.

### FIFTEENTH CAUSE OF ACTION
*Monell*

176.    Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

177.    This is not an isolated incident.  Defendant The City of New York, through its policies, customs, and practices, directly caused the constitutional violations suffered by Plaintiffs.

178.    Defendant The City of New York, through the NYPD, has had, and still has, hiring practices that it knows will lead to the hiring of police officers lacking the intellectual capacity and

moral fortitude to discharge their duties in accordance with the Constitution of the United States and is indifferent to the consequences.

179.    Defendant The City of New York, through the NYPD, has a *de facto* quota/productivity policy that encourages unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury.

180.    This quota/productivity policy requires that police officers, including the individual defendants named herein, make a certain number of arrests and/or write a certain number of summonses and desk appearance tickets within an allocated time period.

181.    Officers that meet the required number of arrests, summonses, and desk appearance tickets are classified as active officers.

182.    Officers that do not meet the required number of arrests, summonses, and desk appearance tickets are classified as inactive officers.

183.    Active officers are given promotion opportunities that are not afforded to inactive officers.

184.    Active officers are given overtime opportunities, such as security at parades, etc., that are not afforded to inactive officers.

185.    The quota/productivity policy does not differentiate between arrests, summonses, and desk appearance that are supported by probable cause and ones that are not.

186.    Defendant The City of New York, through the NYPD, does nothing to ensure that officers, in trying to fulfill this quota policy, are making arrests and issuing summonses and desk appearance tickets lawfully.  There are no post-arrest investigations that are performed, and no

policies in place that would prevent abuse of this policy, such as is demonstrated in the instant case.

187.   Defendant The City of New York, through the NYPD, does nothing to determine the outcome of the charges levied against arrestees in order to properly counsel officers as to the lawfulness of their arrests/issuance of summonses and desk appearance tickets.

188.   The failure of Defendant The City of New York to, *inter alia*, take these steps encourages, *inter alia*, unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury, in that the quota policy provides, *inter alia*, career and monetary incentives to officers, including the individual defendants herein.

189.   Defendant The City of New York, through the NYPD, has a *de facto* overtime policy that encourages and incentivizes unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury.

190.   Defendant The City of New York, through the NYPD, provides officers, including the individual defendants herein, with overtime opportunities when arrest are made, or summonses and desk appearance tickets are issued.

191.   Upon making an arrest or issuing summons or desk appearance ticket, an arresting officer submits a request for overtime to his commanding officer.

192.   These requests are essentially rubberstamped, with commanding officers performing no investigation into the circumstances of the arrest.

193.   Defendant The City of New York, through the NYPD, does not perform any post-arrest investigation and there are no policies in place to prevent abuse of this overtime policy.

194. As a result of this overtime policy, officers, including the individual officers named herein, abuse this overtime policy, making baseless arrests and wrongfully issuing summonses and desk appearance tickets to substantially supplement their income through overtime pay.

195. Defendant The City of New York, at all relevant times, was aware that the individual defendants routinely committed constitutional violations such as those at issue here and has failed to change its policies, practices, and customs to stop this behavior.

196. Defendant The City of New York, at all relevant times, was aware that the individual defendants are unfit officers who have previously committed the acts alleged herein and/or have a propensity for unconstitutional conduct.

197. Defendant NYCHHC, at all relevant times, was aware that the individual defendants routinely committed constitutional violations such as those at issue here and has failed to change its policies, practices, and customs to stop this behavior.

198. Defendant NYCHHC, through its policies, customs, and practices, directly caused the constitutional violations and damages suffered by Plaintiffs.

199. Given the widespread conduct by the individual defendants herein, in acting against NYCHHC rules and regulations, and the United States Constitution, and in high-level decision-makers of Defendant NYCHHC approving of the individual defendants' courses of action, it is clear that, despite any rules and regulations, Defendant NYCHHC has policies, customs, and practices that go against its own rules and regulations, and the protections guaranteed by the laws of the United States.

200. Defendant NYCHHC, at all relevant times, was aware that the individual defendants routinely committed constitutional violations such as those at issue here and has failed to change its policies, practices, and customs to stop this behavior.

201. Defendants The City of New York and NYCHHC has training and supervision policies and practices, and/or the lack thereof, which caused their agents, servants, and/or employees, including the individual defendants herein to fail to discharge their duties in accordance with the Constitution of the United States, and the rules and regulations of Defendants The City of New York and NYCHHC, and are indifferent to the consequences.

202. These policies, practices, and customs were the moving force behind Plaintiffs' injuries.

## SIXTEENTH CAUSE OF ACTION
### *Loss of Services and Consortium*

203. Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

204. At the time of his arrest, Mr. Jimenez was working two jobs to support his family.

205. Due to the foregoing, Mrs. Jimenez lost the services; consortium; and love and affection of her husband, Mr. Jimenez, causing her, *inter alia*, emotional distress.

206. As a result of the foregoing, Plaintiffs sustained the damages herein alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests judgment against Defendants as follows:

(a) Compensatory damages against all defendants, jointly and severally;

(b) Punitive damages against the individual defendants, jointly and severally;

(c) Reasonable attorney's fees and costs pursuant to 28 U.S.C. § 1988; and

(d)     Such other and further relief as this Court deems just and proper.

Dated: New York, New York
      April 27, 2014

Gregory P. Mouton, Jr., Esq.
The Law Office of Gregory P. Mouton, Jr.
Attorney for Plaintiffs
305 Broadway, 14th Floor
New York, NY 10007
Phone & Fax: (646) 706-7481
greg@moutonlawnyc.com