Ecfnjimc                          Conference

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   PATRICIO JIMENEZ, et al.,

 4                  Plaintiffs,

 5            v.                          14 Civ. 2994 (SAS)

 6   THE CITY OF NEW YORK, et al.,,

 7                  Defendants.

 8   ------------------------------x

 9                                        New York, N.Y.
                                          December 15, 2014
10                                        3:05 p.m.

11   Before:

12                 HON. SHIRA A. SCHEINDLIN,

13                                        District Judge

14                        APPEARANCES

15   GREGORY MOUTON
          Attorney for Plaintiffs
16
     NEW YORK CITY LAW DEPARTMENT
17        Attorneys for City Defendants
     BY:  TOBIAS ZIMMERMAN
18
     LESTER SCHWAB KATZ & DWYER
19        Attorneys for Mt. Sinai Defendants
     BY:  THOMAS A. CATALANO
20

21

22

23

24

25

Ecfnjimc                          Conference

1              (In open court)

2              THE COURT:  I have three letters, all dated December

3    3, and then one letter dated December 8.  I have a letter from

4    the city, Mr. Zimmerman.

5              I have a letter from Mount Sinai Hospital and Mount

6    Sinai Hospital Group, from Mr. Catalano.  They are both dated

7    the 3rd.

8              And then there is a letter from Mr. Mouton.  I think

9    it's misdated.  It's dated the 2nd, but I think it's meant to

10   be dated the 3rd, because it responds to the other letters, and

11   it's docketed on the 3rd.  So I think it's meant to be dated

12   the 3rd.

13             Then I have a letter dated December 8, from

14   Mr. Mouton -- actually, the second letter, of the 8th, responds

15   to the Mount Sinai's letter, and his letter of the 3rd responds

16   to the City's letter.  That's why there's two letters from

17   plaintiffs' attorney, and one each from each of the defendant

18   groups.

19             The letter from the City and also from the Mount Sinai

20   defendants asks for two forms of relief.  It says that the

21   third amended complaint essentially can't stand and shouldn't

22   be permitted to stand and it was filed inappropriately without

23   permission of the Court and beyond what the court had said it

24   would allow.

25             Then it also asked for sanctions against the

1   plaintiffs' attorney, Mr. Mouton, for going ahead with this

2   filing.   Then the hospital's letter agrees and says the third

3   amended complaint can't stand against the hospital defendants,

4   and they should be dismissed.

5           And then Mr. Mouton's reply disagrees obviously with

6   both of the two letters and explains why he thinks it was

7   proper to filed the third amended complaint, why the city is a

8   proper defendant in this lawsuit, why Harlem Hospital Center is

9   a proper party in this lawsuit, and then, finally, why the

10   Mount Sinai defendants are proper defendants in this lawsuit.

11           That is, I think, a fair summary of the four letters.

12   But there's some disconnect here, I have to say, because it

13   does feel as if the Court's first opinion and order, which was

14   a lot of work, essentially has been ignored, and so has the

15   conference.   It seems like plaintiffs' attorney is just

16   determined to continue the lawsuit on behalf of Maribel

17   Jimenez, even if there is really no legal ground to stand on

18   and really no jurisdiction.

19           So, Mr. Mouton, I think the ball is in your court to

20   explain to me why some of the arguments made in the defendants'

21   letters aren't correct.

22           For example, in the letter from Mr. Catalano, he says,

23   among other things, Title VI doesn't even have a private right

24   of action based upon language discrimination, and there's no

25   reason that the parallel section of the Affordable Care Act

1    would permit a private right of action either.

2             Then he says that the Mount Sinai SAVI -- I don't know

3    the acronym, but the Mt. Sinai SAVI program doesn't receive

4    federal financial assistance anyway, which is required under

5    the Title VI claim.

6             As you wrote in your letter, it says, Title VI,

7    Section 601 says no person in the U.S. shall on the ground of

8    race, color, or national origin be excluded from participation

9    in or be subjected to discrimination under any program or

10   activity receiving federal financial assistance.

11            Then Mr. Catalano says, well, this program is not

12   receiving federal financial assistance.  So that's one ground

13   to say that the Mount Sinai defendants shouldn't be there.

14            But then he points out, and we went through all this

15   on the motion, that in fact there was an interpreter, a

16   volunteer interpreter present.  I've already addressed that in

17   the first motion.

18            If the person stayed two minutes or ten minutes, it is

19   nothing to do with Mount Sinai.  It's not their problem.  So I

20   don't see why the Mount Sinai defendants are being brought

21   back, and I don't think that is what I allowed.

22            When I allowed leave to amend I was very specific as

23   to the narrow permission there.  It talked about the negligent

24   supervision claim, the negligent hiring claim, and then at the

25   last conference there was a question about federal jurisdiction

anyway, and the city attorney pointed out that Maribel's claims

were state claims only, and there wasn't a basis to bring her

claims here.  So you have invented this idea of the Title VI

claim and the Affordable Care Act claim, which Mr. Catalano

says has no private right of action.

I'm really confused and I am not anxious to go through

another round of briefing again and another motion and

decision, which will probably come out the same way.  I don't

think it's fair to any of us that is, you wasting your time,

the defense counsel wasting their time, and, worst of all, you

are going to waste the Court's time.

I don't think Ms. Jimenez has a case here.  Why don't

you just stick with your false arrest claim, if you have one,

on Patricio's behalf.  I don't know what your problem is with

respect to Maribel.  What is the big claim?  That you don't

think she was given an interpreter for long enough?

MR. MOUTON:  Your Honor, I can tell you the Court has

already addressed this issue in the matter of Loeffler, which

is cited in my response to the Mount Sinai defendants' case.

THE COURT:  I will go look at your letter for a

minute.  Just don't say another word until I can look up what

you just said.  Meanwhile, in your December 8 letter, that's

the one where you cited a whole lot of cases -- and now you are

saying which one?  Matter of what?

MR. MOUTON:  It is in Loeffler.

1          THE COURT:  I clearly can't hear you because I can't

2     find that case.  Could you spell the word you are saying?

3          MR. MOUTON:  L-o-e-f-f-l-e-r.

4          THE COURT:  You are saying it is in this letter.

5          MR. MOUTON:  It is.  It is on page 2.  There is a case

6     which says that --

7          THE COURT:  Surely.  It should say Loeffler.  That's

8     what it should say.  Does it?

9          MR. MOUTON:  Yes.

10          THE COURT:  I see it.  Loeffler v. Staten Island,

11     Second Circuit 2009.  It says, according to your letter,

12     deliberate indifference -- let's start earlier.  "Intentional

13     discrimination does not require personal animosity or ill will.

14     Rather, intentional discrimination may be inferred when a

15     policymaker acted with at least deliberate indifference to the

16     strong likelihood that a violation of a federally protected

17     right will result."

18          Here's the Loeffler case:  "Deliberate indifference

19     can be shown when an official who at minimum has authority to

20     address the alleged discrimination and institute corrective

21     measures on the recipient's behalf, has actual knowledge of

22     discrimination in the recipient's programs and fails adequately

23     to respond."

24          OK.  I see the quote, but I don't know what it has to

25     do with this case.  What is the alleged knowledge of

1  discrimination in the recipient's programs that the hospital

2  failed to respond?  What are you talking about?

3         MR. MOUTON:  Yes, your Honor.

4         So just a little background on the Loeffler case.

5         THE COURT:  I think you need a little background on

6  this case.  I'm sorry.  This case just doesn't sound like

7  either a case or a federal case.  You are tenaciously holding

8  on to something that just is no harm, no foul.  I just don't

9  know what your problem is.

10         Why don't you start from the beginning.  What happened

11  to Ms. Jimenez that makes you think you should be in this

12  federal court on this case?  What happened to her?

13         MR. MOUTON:  For approximately five hours while

14  Ms. Jimenez was at the hospital, they refused to provide her

15  with an interpreter.

16         THE COURT:  Who refused?

17         MR. MOUTON:  The employees at the New York City Health

18  and Hospitals Corporation, HHC, and the Mount Sinai Hospital

19  Group as well.

20         Ms. Jimenez during that time was provided with an

21  interpreter, but only for two minutes of time.  That was via a

22  phone, which goes against the Health and Hospitals rules and --

23         THE COURT:  Who provided this interpreter?

24         MR. MOUTON:  HHC did, New York City Health and

25  Hospitals Corporation.  They did that for two minutes when they

Ecfnjimc                     Conference

1     should have provided her with a face-to-face interpreter.

2              Not only that, but going back to the Loeffler case,

3     which had a similar situation, where for a period of time

4     before an interpreter was provided, the Court said, look, you

5     might have provided that person with an interpreter at some

6     particular point, but before that you refused to provide them

7     with an interpreter, and for those reasons there is a

8     violation.

9              THE COURT:  Violation of what?

10              MR. MOUTON:  A violation of their federally protected

11     rights.

12              THE COURT:  What kind of case?  Is Loeffler a 1983

13     based on solely on the failure to provide an interpreter?

14              MR. MOUTON:  A sign language interpreter was not

15     provided to someone in that particular case until later on

16     during his treatment.

17              THE COURT:  I know.  What is the cause of action?

18     During his treatment?  He is a patient at the hospital?

19              MR. MOUTON:  Yes, your Honor.

20              THE COURT:  What is the cause of action?

21              MR. MOUTON:  I believe it was Title VII, if I am not

22     mistaken.

23              THE COURT:  Title VII isn't Title VI.

24              MR. MOUTON:  Let me give my clerks the citation.  It's

25     582 F.3d 268.

1          If I may, your Honor, I cited Kumantaros v. City of

2     New York, which is on page 1 at the bottom, which says that

3     Title VI and Title VII are analyzed in the same manner.

4               THE COURT:  I saw that.

5               MR. MOUTON:  So any case law would correspond to this.

6               THE COURT:  But that is not right, because Title VII

7     has a private right of action.  Title VI may not.

8               MR. MOUTON:  Again, that's incorrect that that is

9     there no private right of action.  There absolutely is.  There

10    is no private right of action under Section 602, but under

11    Section 601 of Title VII --

12              THE COURT:  I thought were you proceeding under 602.

13              MR. MOUTON:  No, your Honor.  Under 602 --

14              THE COURT:  I thought you were proceeding under 602.

15              MR. MOUTON:  Under 602 it allows HHS to develop rules

16    and mandates and policy that hospitals have to adhere to.

17              THE COURT:  Right.

18              MR. MOUTON:  Under those guidelines, they issued

19    Federal Register Rule 65 247, 80875.  Under that rule, or that

20    mandate, the hospital as well as any other, in this case New

21    York City HHC, and the Mount Sinai Group, they would have had

22    to have provided face-to-face interpreters for my client unless

23    there was an emergency situation, and in that case they could

24    have provided a telephone.

25              We have cited disparate impact, which can be used to

Ecfnjimc                    Conference

1    show that there was an intentional violation in this particular

2    case.

3              THE COURT:  What are you talking about?  What

4    disparate impact?

5              MR. MOUTON:  In this case, we have a situation where

6    the hospital is located in a heavily populated area with

7    Spanish-speaking persons.

8              THE COURT:  Yes.

9              MR. MOUTON:  They knew that.  Because of that they

10   knew that they should have provided face-to-face interpreters

11   at their hospital and they didn't.  That impacts anyone who

12   comes into that hospital who is not English proficient and

13   speaks Spanish.

14             For those reasons it is our belief, and because they

15   have a policy, and actually HHC has a policy that's posted on

16   their website where they only provide Spanish interpreters

17   during business hours, and they provide nothing outside of

18   business hours.  That goes directly against the rules that are

19   provided by HHS.

20             So we have not only shown that there is an intentional

21   violation, because they didn't provide an interpreter to her

22   and let her participate in the services of the hospital,

23   provided she wasn't able to participate in the SAVI program.

24             THE COURT:  What is that acronym.

25             MR. MOUTON:  Sexual assault and violence program, that

1    she was forced to participate in, that she was forced into

2    contact with the criminal justice system.  For all those

3    reasons, that could be used to show that there was an

4    intentional violation.

5            THE COURT:  What was she doing at the hospital for

6    five hours?

7            MR. MOUTON:  She was at the hospital because she

8    passed out in her bathroom and she believed that she was

9    assaulted by her husband.  They tested her.  It was clear to

10   them that she was suffering from diabetes, but they still

11   referred her to the SAVI program.  During the entire time,

12   except for two minutes, she wasn't provided an interpreter.

13   She doesn't speak any English.  She wasn't able to participate

14   at all.

15           THE COURT:  In Loeffler there was an ADA claim,

16   Americans with Disabilities Act claim.  That's it.  ADA.

17           MR. MOUTON:  I would point out, your Honor, also there

18   is case law that says ADA claims and Title VI claims are

19   decided in the same manner.

20           THE COURT:  I know.  But where is the case that says

21   there is a private right of action under Title VI?  Your

22   adversary says there isn't.

23           MR. MOUTON:  In my first page, the remedies available

24   in a private right of action under Title VI are coextensive

25   with those under Title I of ADA and Section 504 of the

Ecfnjimc                    Conference

1   Rehabilitation Act and that's Barnes v. Gorman.

2               THE COURT:  Which is the Supreme Court case.

3          So, Mr. Catalano, this sentence says, citing a Supreme

4   Court case, the remedies available in a private right of action

5   under Title VI are coextensive with those under Title II of the

6   ADA and 504 of the Rehabilitation Act.

7          I can now ask my clerk to look that page up to see if

8   it's true.  How could you write me that there is not private

9   right of action if the Supreme Court says so?

10              MR. CATALANO:  I wrote there wasn't a private action

11  under based upon the language discrimination.  If there is

12  intentional discrimination, there would be a private right of

13  action.

14         The argument they are making is this hospital was

15  located in Harlem.  Harlem has a lot of Hispanic people.

16  That's discriminatory impact.

17         What the Supreme Court held in Alexander v. Sandoval

18  was exactly that.  In that case there was no driver's test in

19  Spanish, and they brought an action based upon that.  The

20  Supreme Court said, no, that's disparate impact.  There's no

21  cause of action.

22         The regulation Mr. Mouton is citing was 2000.  This is

23  2001.  I also cited a case, the Perdide v. Page, which is a

24  California case, but it is exactly the same situation, failure

25  to provide an interpreter.  In that case the disparate impact

1   is what's not cognizable according to the Supreme Court.

2            Of course, that's the more complicated argument.  Our

3   main argument really is there was no interpreter needed.  In

4   the City of New York, the city's required to have an

5   interpreter in the emergency room.  This thing happened

6   Christmas night three o'clock in the morning.  My volunteer was

7   walking up at 2 o'clock in the morning, rushed to the hospital,

8   got there at 3 o'clock in the morning.  Was she supposed to

9   bring an interpreter with her?  The interpreter is always with

10  the emergency room.

11           THE COURT:  Now you lost me.  You said there's always

12  supposed to be an interpreter in the emergency room.  Was there

13  one?

14           MR. CATALANO:  Yes.

15           THE COURT:  You just said no.  He said there was one

16  on the phone for two minutes.

17           MR. CATALANO:  That's what I mean.  There was a phone

18  there.  That is not our job, your Honor.  We are volunteer

19  service.

20           THE COURT:  I thought you just said the hospital was

21  required to have one available in the emergency room at all

22  times?  Didn't you say that?

23           MR. CATALANO:  I did, your Honor.  But they did it by

24  phone.

25           THE COURT:  Which is it?  Are they required to have

Ecfnjimc                    Conference

1    one present in the emergency room at all times?

2                MR. CATALANO:  In my own opinion, your Honor, it

3    doesn't matter.  I am just reading from the statute.

4                THE COURT:  What statute?

5                MR. CATALANO:  It is in a footnote of my letter.

6    Footnote 3.

7                THE COURT:  Yes.

8                MR. CATALANO:  The immediate provision of

9    interpretation services.  What does that mean?  Does that mean

10   by phone or face to face?  I don't know.

11               MR. MOUTON:  Your Honor, if I may.

12               MR. CATALANO:  My situation is we are a volunteer

13   service.  People are at home.  My volunteers are at home

14   sleeping until they get a phone call from the emergency room

15   that someone has complained about being sexually abused.  My

16   client then goes down there by car service.

17               THE COURT:  Who is your client?

18               MR. CATALANO:  Mount Sinai operates the SAVI program,

19   Sexual Assault Violence Intervention program.  That is our

20   program.

21               THE COURT:  Who is your client?

22               MR. CATALANO:  Mount Sinai.

23               THE COURT:  Your client isn't a volunteer service.

24               MR. CATALANO:  Yes, your Honor.  SAVI is a

25   volunteer -- Mount Sinai is --

1          THE COURT:  Mount Sinai is a big hospital.

2          MR. CATALANO:  It is.

3          THE COURT:  It is not a volunteer service.

4          MR. CATALANO:  Ms. Cohen, the woman who went down

5   there, as you previously held in your decision, was a

6   volunteer.  She works as a volunteer.

7          THE COURT:  She does, but you represent Mount Sinai.

8   Mount Sinai has an obligation under this board of health rule

9   to immediately provide interpreting services for

10  non-English-speaking residents in all hospital emergency rooms.

11  They certainly didn't do it immediately.

12         MR. CATALANO:  This is not a Mount Sinai emergency

13  room.  This is a city hospital emergency room.

14         THE COURT:  Oh.

15         MR. CATALANO:  She goes to a city hospital.  We

16  provided services to the city hospital.  The only services we

17  provide are volunteer women.  She gets a call 2 o'clock in the

18  morning.

19         THE COURT:  So she's never at Mount Sinai?

20         MR. CATALANO:  No one's at Mount Sinai.

21         THE COURT:  Oh.

22         MR. CATALANO:  She comes from her house at 2 o'clock

23  in the morning.  She gets to the city hospital, Harlem

24  Hospital, at 3 o'clock in the morning.  She didn't bring an

25  interpreter, because everyone knows that every emergency room

1   has an interpreter.

2              THE COURT:  It didn't?

3              MR. CATALANO:  It did have an interpreter.  The city

4   had supplied an interpreter.

5              THE COURT:  You mean the two minute thing?

6              MR. CATALANO:  I don't know if it was two minutes or

7   not.

8              THE COURT:  Let's assume it was, but it was hours

9   after she came there.

10             MR. CATALANO:  Your Honor, I have an advocate report

11  form.  My client sat down with this woman with an interpreter,

12  on the phone albeit, and I have a whole report about everything

13  she says.

14             THE COURT:  Right.  He says she was there for hours

15  before even the two minutes kicked in.

16             Didn't you say that, Mr. Mouton?

17             MR. MOUTON:  Yes, your Honor.  And after those two

18  minutes --

19             THE COURT:  What time did she arrive?

20             MR. MOUTON:  She arrived early in the morning.  I

21  believe was 2 a.m.

22             THE COURT:  When did she get the two minutes?

23             MR. MOUTON:  She got the two minutes hours later.

24             THE COURT:  Does the report say what time?

25             MR. CATALANO:  2:59.  Well, the client's time of

Ecfnjimc                          Conference

 1    arrival was 2:59 a.m., and I am not sure when my person got

 2    there.

 3              THE COURT:  He's saying it's hours.

 4              MR. MOUTON:  Your Honor, the issue here is that Mount

 5    Sinai has these satellite programs at various hospitals.  I

 6    don't know if there is an agreement between Mount Sinai and New

 7    York City HHC to provide interpretation services, but if Mount

 8    Sinai has these satellite services and they are located in this

 9    Hispanic neighborhood, they should be providing interpretation

10    services pursuant to the HHS regulations, unless there is some

11    sort of on agreement where they are going to be indemnified by

12    the city.

13              THE COURT:  Is this an HHS regulation or a city

14    regulation?  It says, his letter, "The board of health shall

15    require the immediate provision of interpretation services."

16              MR. MOUTON:  No, your Honor.  It is in the Federal

17    Register --

18              THE COURT:  This footnote is whose regulation, the

19    quote.  Sat.

20              MR. CATALANO:  That is from the city charter, the

21    administrative code.

22              MR. MOUTON:  I'm citing a federal rule that is

23    promulgated by HHS.

24              THE COURT:  What does that one say.  Is that in your

25    letter?

Ecfnjimc                    Conference

1        MR. MOUTON:  It says that health care organizations --

2  yes, your Honor, on page 2.

3        THE COURT:  Which letter?  You have two letters.

4        MR. MOUTON:  I apologize.  The December 8 letter, on

5  page 2.  It says, "Health care organizations must offer and

6  provide language assistance services at no cost to each

7  patient" --

8        THE COURT:  Let me find it.  Go ahead.

9        MR. MOUTON:  -- "with limited English proficiency at

10  all points of contact in a timely manner during all hours of

11  operation."

12        It says that that this is mandated for all recipients

13  of federal funds.  It goes on to define what it believes that,

14  how they should provide these interpretation services.

15        THE COURT:  He's saying he is not a recipient of

16  federal services.

17        MR. MOUTON:  The SAVI program might not directly

18  receive funds but Mount Sinai does, and Mount Sinai controls

19  the SAVI program.  It is not a separate division.  The statute

20  defines a program as a business that operates a health care

21  organization.  That's what it defines it as, not as some

22  separate program that they offer or anything like that.  It's

23  whether or not the business that runs that program is a health

24  care organization.

25        MR. CATALANO:  Your Honor, we are not providing heath

1    care in this instance, as you previously held.  We are

2    providing a person, a woman, a volunteer who comes in, and

3    she's there to hold a person's hand to give them advice as to

4    what they need to do in terms of obtaining more services or

5    counseling, that they have a right to bring charges, things

6    like that.  That program is mandated by the city.  So we are

7    not providing any medical care.  It would be unrealistic --

8             THE COURT:  Basically you are saying you are not a

9    health care organization, but he's saying Mount Sinai is a

10   health care organization.

11            MR. MOUTON:  Your Honor, if I may, on page 1, I

12   actually have the definition of it.  It's in paragraph 2 of the

13   December 8 letter.  It says, "A program or activity is defined

14   as an entire corporation, partnership, or other private

15   organization or an entire sole proprietorship which is

16   principally engaged in the business of providing health care."

17   That's 42 U.S.C. 2000d-4A.  That is exactly what Mount Sinai

18   is.

19            THE COURT:  Mount Sinai is, SAVI isn't.  You are

20   saying it doesn't matter.  SAVI is just a program operated by

21   Mount Sinai.

22            MR. MOUTON:  Yes, your Honor.

23            MR. CATALANO:  Is everyone supposed to bring an

24   interpreter?  Should doctors have their own interpreter or

25   nurse?

Ecfnjimc                    Conference

1          THE COURT:  No.  As it relates to the emergency room,

2     there should be somebody on duty all the time, just like there

3     is a doctor on duty, a resident on duty, an intern on duty.  I

4     guess there has to be an interpreter on duty in every emergency

5     room.

6          MR. CATALANO:  Exactly, your Honor.  But there was.

7          THE COURT:  No, there wasn't.  I don't know what time

8     this two minutes occurred.  She got there at 2:59.  I don't

9     know.  He says hours.  Let's say that this interpreter kicked

10    in at 5 a.m.  She is in the hospital emergency room for two

11    hours unable to communicate.

12         MR. CATALANO:  That has nothing to do my client.

13         MR. ZIMMERMAN:  If I may, your Honor.

14         THE COURT:  Go ahead, Mr. Zimmerman.

15         MR. ZIMMERMAN:  If I may, your Honor first of all, I

16    would like to point out in the original complaint, part of the

17    claim was that the interpretation services provided were

18    inadequate.  In fact, CyraCom, the company that provided those,

19    was a party before your Honor and you dismissed it.

20         If I could take a step back, now very in the weeds on

21    the facts of this case, which since we are at the pleading

22    stage, we have only given the Court -- the first translator in

23    this case was plaintiffs' own daughter who allegedly informed

24    the EMTs that she had been assaulted by her husband when he

25    came home drunk.  The EMTs wrote that in their ambulance call

 1    report.  That information was passed along the chain of

 2    command.

 3          My specialty, as you know, is false arrest cases.  I

 4    am not prepared to argue whether there is a private right of

 5    action for a violation of the New York Administrative Code,

 6    etc.  If Mrs. Jimenez has a claim for the negligent provision

 7    or the failure to provide, the negligent disclosure, I think

 8    that claim should be in state court.

 9          THE COURT:  I know you do.  But he thinks there is a

10    federal claim under Title VI and under the Affordable Care Act,

11    and he gives all these cases of why the Supreme Court and other

12    courts have said so.

13          MR. ZIMMERMAN:  I would suggest in response to his

14    letter he suggests that it would be inefficient, because if he

15    filed a separate federal action, it would simply be

16    consolidated with this one.

17          I would disagree.  There is really no commonality of

18    the facts and circumstances.  So, if he has a legitimate claim,

19    I would urge him to file a complaint on behalf of Ms. Jimenez

20    that makes those claims, and we can move ahead with the false

21    arrest claim in this case that is really what we are all here

22    for.

23          THE COURT:  Let me understand.  You are saying if he

24    has a federal case for Mrs. Jimenez under these federal laws,

25    Title VI or the Affordable Care Act, or both, you are saying

Ecfnjimc                    Conference

1   that is really a separate lawsuit.  That is her issue, that is

2   not the false arrest case against Mr. Jimenez, and they are

3   really not one case.

4             MR. ZIMMERMAN:  Absolutely, your Honor.

5             THE COURT:  She really has her own case, her own

6   problem.  It is either viable under the law or not viable.  But

7   it's really not related to the alleged false arrest for him.

8             MR. ZIMMERMAN:  Absolutely, your Honor.  In fact, the

9   claims are --

10            THE COURT:  I guess the only way it's related is if

11  she could have told the hospital that he didn't do anything.

12            MR. ZIMMERMAN:  But the police interviewed her.

13            THE COURT:  What?

14            MR. ZIMMERMAN:  The police interviewed her several

15  weeks after the hospital.  In fact, the detective that was just

16  added was only present for that interview.  He translated.

17  And, again, allegedly she told them that she had been

18  assaulted.

19            The false arrest, the allegedly false arrest was based

20  on a chain of information that only partially included the

21  hospital.  The police didn't make the arrest until long after

22  she had been released from the hospital.  So there may be some

23  overlap in the early part of the case, but the legal issues are

24  completely different, divergent as we can --

25            THE COURT:  They are.  Your issue is going to be was

 1    there probable cause for the arrest.  If she said after being

 2    released from the hospital, "He assaulted me," then one would

 3    think there is probable cause, and that's it for the false

 4    arrest case and we move on to this other case.

 5         MR. ZIMMERMAN:  In fact, if plaintiffs' allegations

 6    are -- I think his case contradicts itself in a certain sense,

 7    because if the allegations about the hospital fabricating

 8    records is true, then the police again have probable cause

 9    because they are acting on information that they are entitled

10    to accept as reliable.

11         So I don't think that it helps the plaintiffs very

12    much to lump these two cases together.  I certainly would

13    rather proceed with the case I understand the law in and am

14    able to argue to your Honor.  We are ready to answer the

15    complaint on those charges and proceed.

16         THE COURT:  That is another good thought, Mr. Mouton.

17    Why isn't her case -- her case, being deprived of language --

18    by the way, my clerk did look up the Barnes case, which is the

19    Supreme Court case, Barnes v. Gorman, and it would be a private

20    right of action, but only for intentional conduct.

21         MR. MOUTON:  Yes, your Honor.

22         THE COURT:  The question is, is this going to be

23    provably intentional?  Even so, this is a different case.  This

24    is a case about either they did or didn't fail to comply with

25    the law of providing an interpreter in the emergency room.

1    Either it was or wasn't intentional.  It really doesn't have

2    anything to do with a false arrest case for Mr. Jimenez.

3              MR. ZIMMERMAN:  If I make one other additional point,

4    your Honor, the existence of 1988 and the attorney's fees under

5    the 1983 action is another particular reason that this

6    complicated issue should be separated.  At the very least, if

7    they are allowed to proceed together, I would ask that the

8    Court order Mr. Mouton to bill separately for them.

9              THE COURT:  I don't think they should proceed

10   together.  I also feel like I have two different cases.  That's

11   why my head was spinning a little bit.  I was reading records

12   looking at a false arrest case, and suddenly I am in the weeds

13   of a case about whether you have to provide an interpreter or

14   not and under what federal statute and whether it's intentional

15   or can it be disparate impact.  Apparently it can't be

16   disparate impact.  It has to be intentional discrimination.

17             I don't know why, if she was deprived of an

18   interpreter for a couple of hours on Christmas Day or Christmas

19   Eve, why you think that's because she was Hispanic.  If they

20   didn't have their interpreter there at all, that would apply to

21   anybody who walked into the ER.  I don't know why you think she

22   was singled out.  I guess you think it's because the area had a

23   high Hispanic population, so everybody knew that people were

24   going to walk who were going to speak Spanish, even though she

25   comes in apparently with a daughter who acts as an interpreter.

1        I can't try the case now.  I think that's what we are

2   kind of doing.  I think Mr. Zimmerman's last point is right.  I

3   am not going to allow this third amended complaint to be filed.

4   It can't be filed as of right.

5        I did not issue an order permitting this third amended

6   complaint.  I am striking this third amended complaint.  You

7   can bring a lawsuit on her behalf.  Buy a docket number, bring

8   the lawsuit, do what you want with it.  It is a different

9   lawsuit than the false arrest claim.  I give the limited right

10  for leave to amend.  You did something different.  That is

11  fine.  It is a separate lawsuit.

12        MR. MOUTON:  Your Honor --

13        THE COURT:  That is my ruling today, Mr. Mouton.  You

14  are going to have to live with it.  Bring a lawsuit for

15  Mrs. Jimenez for the depravation of an interpreter, and we'll

16  see how it plays out over the months and years ahead.

17        Let's move on with my very straightforward false

18  arrest case.

19        MR. MOUTON:  Certainly, your Honor.

20        THE COURT:  I am not so sure you were right that you

21  were right when you predicted, so I have to bring a separate

22  case, it's only going to get consolidated it is all going to be

23  one case, and we are going to be spinning our wheels.  I am not

24  sure that is right.

25        MR. MOUTON:  Well, your Honor, I reviewed the

Ecfnjimc                    Conference

1  reasoning behind things being marked related.  I will have to

2  plead almost exactly the same facts in that case, except for a

3  few paragraphs.  I think I will to mark it as being related.

4           THE COURT:  You will do what you have to do.  But the

5  Court has its own rules.

6           MR. MOUTON:  Certainly, your Honor.  The only thing I

7  would ask, your Honor, is that I be able to transfer the state

8  causes of action to that case because they are all part of the

9  same facts.

10           THE COURT:  Wait.  What are you talking about?  What

11  state causes of action against whom on behalf of what

12  plaintiff.

13           MR. MOUTON:  Certainly, your Honor.  In the complaint

14  I have some state causes of action.

15           THE COURT:  On behalf of Maribel?

16           MR. MOUTON:  On behalf of Maribel, yes, your Honor.

17           THE COURT:  The Maribel lawsuit is a lawsuit I haven't

18  seen before.  You will write your complaint in Maribel.

19           MR. MOUTON:  I already thought in this particular case

20  there was already --

21           THE COURT:  The third amended complaint is completely

22  stricken now.

23           MR. MOUTON:  Yes.  But before that, your Honor, I had

24  a state law claim.

25           THE COURT:  They were state law only.  I had no

1    federal jurisdiction over those.  Those are gone from my false

2    arrest case.  Whenever you bring the case on behalf of Maribel,

3    this brand-new case you can plead federal and state claims, of

4    course.  Bring any claims you want.

5           MR. MOUTON:  I guess the only issue is that the time

6    to write that lawsuit has passed, so if I remove them from this

7    case and then bring them in another case, it will be too late.

8           THE COURT:  Not necessarily.  You may have tolling

9    from the time that you originally brought them.  That is an

10   argument that will have to be briefed before whatever judge has

11   the Maribel case.

12          MR. MOUTON:  Yes, your Honor.

13          THE COURT:  That's what is going to happen.  For the

14   false arrest case that I have, do you need to file a second

15   amended complaint, that's where I'm lost?  On behalf of

16   Patricio Jimenez, was there anything to change, or we're fine

17   with the original complaint.

18          MR. ZIMMERMAN:  I think we are talking about the

19   second amended complaint now, which was superseded by the

20   third.  The second amended complaint -- my big request is that

21   all these health care defendants, the New York HHC, all of

22   those --

23          THE COURT:  That's the other case.

24          MR. ZIMMERMAN:  -- be taken out.

25          THE COURT:  I agree.

Ecfnjimc                     Conference

 1            MR. ZIMMERMAN:  -- of Patricio's claims.

 2            THE COURT:  I agree.  His case is a straightforward

 3     false arrest case.

 4            MR. ZIMMERMAN:  We should have a complaint that

 5     pleads --

 6            THE COURT:  That's what I think, too.  That is what I

 7     am saying.  We need an amended complain in the Patricio action,

 8     and we need a new complaint in the Maribel action.  Where

 9     things fall out on the statute of limitations they do, but it

10     is not a foregone conclusion that it is untimely, because it

11     may relate back.

12            MR. MOUTON:  The one thing.I wouldn't point out, your

13     Honor, is that the city defendants have alleged that the city

14     is no longer a proper defendant in this case, but there are

15     respondeat superior claims against the City of New York that

16     are viable in this case, and they are, and the city is a proper

17     defendant in this case.

18            THE COURT:  In the state law claims for Patricio.

19            MR. MOUTON:  Yes, your Honor.

20            MR. ZIMMERMAN:  I concede that, your Honor.  That was

21     an error on my part.

22            THE COURT:  OK.  He agrees with you.  I need a new

23     complaint on the false arrest case.  I need a new complaint

24     entirely on the Maribel case.  If you want to mark it related,

25     that is up to you.  I am not saying whether I will take it.

Ecfnjimc                    Conference

1   There's lots of steps now.

2               MR. MOUTON:  Yes, your Honor.  I will review the rules

3   again.  If it is, I will mark it.  If it's not, I won't mark it

4   as well.

5               THE COURT:  That's fine.  I am not getting involved in

6   the sanctions part of the case.

7               MR. CATALANO:  Your Honor, can I assume that Mount

8   Sinai will be out of this case?

9               THE COURT:  I don't think they should be in the false

10  arrest case.  Do you?

11              MR. MOUTON:  I don't think they will be.  I will

12  prepare another complaint tomorrow and obviously I will serve

13  it.

14              THE COURT:  That's right.  They are not in the false

15  arrest.

16              MR. CATALANO:  There's this mediation coming up also.

17  I want to make sure we get out of that.

18              THE COURT:  I think we're set for today.  You don't

19  have to answer, the third amended complaint is stricken.  I

20  will issue a one-line order doing it.

21              MR. MOUTON:  Do I file a fourth amended complaint.

22              THE COURT:  No.  The third amended complaint is

23  stricken, the second amended complaint is stricken.  It would

24  be a new second amended complaint in the false arrest case.  I

25  will issue an order saying that so you know that.  It will be

Ecfnjimc                        Conference

1    on the docket.

2              MR. ZIMMERMAN:  The mediation office asked us to bring

3    to your Honor's attention the schedule because they felt

4    compelled to schedule a mediation even though this dispute was

5    going on.  I guess we need to push the mediation date back

6    since we have now pushed the whole case another month without

7    an answer.

8              THE COURT:  I don't know what the answer has to do

9    with the mediation.  You know the facts of this case.  Go

10   mediate.

11             MR. ZIMMERMAN:  The question was because they were

12   trying to bring Mount Sinai into the mediation.

13             THE COURT:  The mediation is the false arrest case.

14             MR. ZIMMERMAN:  All right.

15             THE COURT:  I will issue a short order.

16             MR. ZIMMERMAN:  I appreciate it.  Thank you very much,

17   your Honor.

18             MR. CATALANO:  Thank you, your Honor.

19             THE COURT:  Do you have a scheduling order in place in

20   the false arrest?

21             MR. MOUTON:  We do.

22             MR. ZIMMERMAN:  We do except that I will need a new

23   date to answer based on when this.

24             THE COURT:  You will work that out.  But the rest of

25   the schedule should be able to stand?

Ecfnjimc                        Conference

1            MR. ZIMMERMAN:  I believe so, your Honor.

2            MR. MOUTON:  Yes, your Honor.

3            THE COURT:  All right.  Good.  Thank you.

4            (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25