UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

| | |
|---|---|
| PATRICIO JIMENEZ, | DECLARATION OF GREGORY MOUTON IN OPPOSITION |
| Plaintiff, | |
| -against- | 14 Civ. 2994 (SAS) (FM) |
| THE CITY OF NEW YORK, DETECTIVE JAMES QUILTY, DETECTIVE MIGUEL LOPEZ, and JOHN/JANE DOE # 1, | |
| Defendants. | |

------------------------------------------------------------------------x

Gregory P. Mouton, Jr., Esq., an attorney duly admitted to practice in the Courts of New York, declares, under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following statements are true:

1.    I am the attorney for Plaintiff Patricio Jimenez in the instant matter. As such, I am familiar with the facts and circumstances of this action.

2.    This declaration is respectfully submitted in opposition to Defendants' application for attorneys' fees, as well as sanctions imputing any attorneys' fee award under 42 U.S.C. § 1988 against the undersigned pursuant to FRCP Rule 56(h), 28 U.S.C. § 1927, and the Court's inherent power.

3.    I make this affirmation based upon my review of my file and papers for this action. For the reasons set forth herein, as well as the reasons stated in the accompanying Memorandum of Law In Opposition, Defendants' request for attorneys' fees and sanctions should be denied.

## SANCTIONS UNDER FRCP RULE 56(h) ARE NOT WARRANTED

4. Sanctions pursuant to Rule 56(h) requires a finding of "bad faith," which courts have found only when the attorney's conduct is "egregious," such as "where affidavits contained perjurious or blatantly false allegations or omitted facts concerning issues central to the resolution of the case." Jaisan, Inc. v. Sullivan, 178 F.R.D. 412, 415–16 (S.D.N.Y.1998).

*Sanctions against counsel are not warranted for any alleged false statements made by Mrs. Jimenez*

5. To the extent that Defendants rest their argument of bad faith on any alleged false statements made by Mrs. Jimenez that can be imputed to the undersigned, such an argument fails for three reasons.

6. First, there has been no finding in this matter that the statements made by Mrs. Jimenez were perjurious, but only that it was "highly likely" that her statements were such.

7. Second, even if there was a finding of perjury on the part of Mrs. Jimenez, any bad faith on her part cannot be imputed to the undersigned. See Scivantage, 525 F.Supp.2d 448 at n. 331 ("a finding of bad faith is personal to the offender and thus cannot be attributed to another, such as an offending attorney's client or law firm, through such legal doctrines as vicarious liability") (citing Gregory P. Joseph, SANCTIONS — THE FEDERAL. LAW OF LITIGATION ABUSE 446 (Matthew Bender 2000)).

8. Even assuming, *arguendo*, that the Court had found Mrs. Jimenez committed perjury based on the record of admissible evidence, the issue of Mrs. Jimenez's credibility from counsel's perspective is not so clear cut as to find that I had "actual knowledge" that Mrs. Jimenez was allegedly falsely testifying. See Muhammad v. Walmart Stores E., L.P., 732 F.3d 104, 108-

09 (2d Cir. 2013) (reversing the district court's imposition of sanctions because the court misapplied the relevant legal standard of subjective bad faith by couching "its conclusion in terms of what 'any competent attorney' would have done" rather than on actual knowledge).

9. Having met with Mrs. Jimenez both with and without Mr. Jimenez present, she has, at all times appeared credible to me, even when confronted with various reports that contradicted her version of events. Each time I spoke with her, she was very emotional about the manner in which she believed she and her family were treated by members of the NYPD.

10. While, ultimately, the Court determined that there was not enough evidence to support Mrs. Jimenez's version of the events to defeat summary judgment, there were pieces of information uncovered that led the undersigned to believe that her allegations were not "blatantly false".[1] First, there were two phone calls to 9-1-1 where it was reported that Mrs. Jimenez had fallen in her bathroom and that she had diabetes. See Sprint Report, Docket Entry No. 112-9. This was corroborated by the medical records provided to me which indicated that Mrs. Jimenez had been treated at Harlem Hospital for hyperglycemia as a result of her uncontrolled diabetes.

11. Mrs. Jimenez also reported to me that while she was at the hospital, she was not provided with an interpreter, save for one provided to her for two minutes on the phone. This was actually corroborated by two things. First, at the conference in this matter on December 15, 2014, Thomas Catalano, Esq., attorney for the Mount Sinai Defendants, confirmed that there should have been an interpreter at the hospital at all times, but that there was not one. See Transcript from

---

[1] The reasons set forth herein comprise just the non-privileged communications between Mrs. Jimenez and the undersigned. Further information from Mrs. Jimenez was provided to the undersigned that also created the impression that Mrs. Jimenez's statements were not "blatantly false".

December 15, 2015, Conference, Docket Entry No. 75 at pp.13:11-14:3.  It was also apparent from the hospital's own policies that no interpreter was physically present, given that the hospital only employs interpreters during daytime hours.  <u>See</u> Harlem Hospital Webpage, annexed hereto as Exh. 7.  Research into Cyracom, the telephonic interpretation service, uncovered that, upon information and belief, the use of telephonic interpreters was only available (1) at patient entrances and inside the medical units at Harlem Hospital,[2] and (2) with the use of an authorization code and/or PIN number.[3]  While Hannah Cohen alleges that she spoke to Mrs. Jimenez through a Spanish interpreter, there is no doubt, based on her own attorney's acknowledgment and Harlem Hospital's policies, that no Spanish interpreter was physically present in Harlem Hospital at the time Ms. Cohen spoke to Mrs. Jimenez.  Had Cyracom been contacted, I would have also expected that an authorization code and/or PIN number would have been produced as evidence that such an interpreter was used, but such information is wholly absent from Hannah Cohen's affidavit and report.  <u>See, generally</u>, Affidavit of Hannah Cohen, Docket Entry No. 21; Advocate Report Form, Docket Entry No. 19-3 (these documents are under seal).  Given the foregoing, I had reason to believe that Mrs. Jimenez was being truthful when she told me that she could not communicate with the medical personnel and Ms. Cohen while she was at Harlem Hospital.

---

[2] Although the webpage annexed as Exh. 7 states that interpretation services are available from any phone at Harlem Hospital, clicking on the link "Language Line" brings you to the webpage which is annexed hereto as Exh. 6 which provides that the Cyracom (interpretation service) phones are only available at patient entrances and inside the medical units at Harlem Hospital.

[3] While there are no publicly available procedures for use of Cyracom phones at Harlem Hospital, other medical providers set forth the procedures that are required to use Cyracom's interpretation services.  <u>See, e.g.</u>, GRHealth Cyracom Instructions, annexed hereto as Exh. 5 (found at http://www.grhealth.org/media/File/Patient%20Family%20Centered%20Care/using%20the%20cyracom%20(blue%20Phone).pdf)

12. Further bolstering Mrs. Jimenez's credibility was the fact that the Domestic Incident Report ("DIR") contains key errors. The first is that the DIR notes that Mrs. Jimenez is a black Hispanic, which is wholly untrue. See Domestic Incident Report, Docket Entry No. 112-11. As well, the report notes that Mrs. Jimenez's husband's name is Patricio Hernandez. While it would be easy enough to write such errors off as either officer mistakes or deliberate misinformation on Mrs. Jimenez's part, in the context of her statements that she never spoke with any officer while at Harlem Hospital, these glaring errors supported what she told me. Physically, Mrs. Jimenez does not appear to be a black Hispanic, and the correct name of an alleged perpetrator would be something that a member of the NYPD should get right if barriers to communication had been overcome.

13. As for the interactions between the individual defendants and Mrs. Jimenez, what Mrs. Jimenez says happened simply diverges from what the individual defendants allege, all the way from what was said to how many times they met. In my experience, this did no demonstrate that Mrs. Jimenez was not providing truthful information as this is not the only case where a client has come to me with a set of facts that seems so incredible that it diverges from all of the the evidence supplied by members of the NYPD, as well as third-parties including witnesses and other seemingly uninterested parties.

14. For instance, in the matter Anonymous Plaintiff v. The City of New York, et al., 13 Civ. 8928 (JSR) (S.D.N.Y), the individual officers responded to the scene of a murder. There, they alleged that they found a man dead in the road, and my client, Anonymous Plaintiff, "under the influence of alcohol", stating that he was "groggy and incoherent, unbalanced, and to have

poor coordination." See Criminal Court Complaint, annexed hereto as Exh. 8.[4]  After canvassing for witnesses, the members of the NYPD alleged there was probable cause to believe Anonymous Plaintiff committed vehicular manslaughter by running his friend over with a car, even bolstering this claim with a "witness".  The NYPD and a seemingly uninterested party, the Office of the Chief Medical Examiner, generated 100+ pages of documents to support these allegations.  However, discovery and investigation revealed an actual witness to the crime who rebutted every allegation made by the individual officers and established that their "witness" was a sham, and that the individual officers knew it.  Further, it turned out that the individual defendants had never seen Anonymous Plaintiff in any drunken state, because when they arrived, Anonymous Plaintiff was laying in the road unconscious and barely clinging to life after having clearly been beaten and run over by a car repeatedly.

15.     In Anonymous Plaintiff, my client did what is notoriously difficult for many people who bring § 1983 cases: he was able to acquire admissible evidence that his tall tale of innocence was not so far-fetched after all.  Had he not, Anonymous Plaintiff and the undersigned would be facing motions for sanctions and attorneys' fees based on the logic offered by Defendants.[5]  That admissible evidence supporting Mr. Jimenez's, or even Mrs. Jimenez's, position was not able to be discovered in this matter, does not mean that sanctions are warranted.

*Sanctions are not warranted against counsel for assisting Mrs. Jimenez in drafting her affidavit*

---

[4] The name of Anonymous Plaintiff and his friend, as well as other identifiable information, are redacted given that the Court allowed the filing under a pseudonym given that the murder and attack described herein were committed by violent gang members.  The undersigned will provide a copy of the unredacted version to the Court should the Court request it.

[5] It is not often that the cases where this occurs comes to the attention of the Court, given that the City quickly settles matters when the misconduct of its officers comes to light so that the actions of its officers are not discovered.

16.     Defendants insinuate that, in some way, I suborned perjury by drafting Mrs. Jimenez's affidavit.  This could not be further from the truth.

17.     First, while the various complaints that were filed in this matter do indicate that Detective Lopez translated for Mrs. Jimenez the second time that the officers came to her home, such a statement was not borne of bad faith, but simply a misunderstanding about what was being communicated to me by Mrs. Jimenez when I performed my initial interview of her.

18.     It was not until I met with Mrs. Jimenez regarding the City's motion for summary judgment that I discovered that she did not mean that Detective Lopez had translated, but, rather, that she had had a direct conversation with him as set forth in paragraph 27 of her affidavit.  The allegation in the pleading was nothing more than a mistake based on a miscommunication, and does not rise to the level of sanctionable conduct.  See Baseball Quick, LLC v. MLB Advanced Media, L.P., 11 Civ. 1735 (TPG) at *11 (S.D.N.Y. Mar. 30, 2012) (finding no sanctionable conduct for misstatements that were the result of a mistake) (annexed hereto as Exhibit 13).

19.     Furthermore, it should not come as a surprise that Mrs. Jimenez required assistance with the drafting of her affidavit.  As noted in the accompanying Memorandum of Law, Mr. and Mrs. Jimenez, educated in their home country of Mexico, have no more than a sixth grade education.  I met with Mr. and Mrs. Jimenez on August 18, 2015, for approximately three hours repeatedly going over the details of their affidavits to ensure their accuracy.  At this meeting, Evelyn Figueroa was the interpreter.  See Check No. 1058, annexed hereto as Exh. 2.[6]

---

[6] Ms. Figueroa was also the interpreter present for my initial interview of Mrs. Jimenez. See Check No. 1019, annexed hereto as Exh. 1.

20.	To further ensure the accuracy of the affidavits in light of the previous misunderstanding, I met with Mr. and Mrs. Jimenez again on August 20, 2015, but with a different interpreter, Luis Lopez, a court-certified interpreter and translator affiliated with Eiber Translations, Inc.  See Invoice dated September 7, 2015, annexed hereto as Exh. 3.  This interpreter was also the person who swore that he translated the affidavit to Mrs. Jimenez, and that Mrs. Jimenez said that she understood it.  See Affidavit of Maribel Jimenez, Docket Entry No. 114 at p. 5.

21.	Defendants' accusation that I created a sham affidavit and then submitted it to the Court is patently false, and, frankly, insulting.  Moreover, this situation resembles nothing that appears in Luscier v. Risinger Brothers Transfer, Inc., No. 13 Civ. 8553 (PKC), 2015 U.S. Dist. LEXIS 129640.  In that matter, the attorney submitting the affidavit had not spoken with the witness concerning the contents of the affidavit, forged the witness' name to the affidavit, notarized the sham affidavit, and later lied to the Court about how the affidavit was procured.  None of these elements are present in this matter, although Defendants would try to lead the Court to that conclusion through their baseless assertions which they substantiate with nothing more than hypothetical scenarios rather than actual evidence.  Under all of Defendants' scenarios, both the interpreter from Eiber Translations and Ms. Figueroa would've needed to be complicit.[7]

22.	Given all of the foregoing, sanctions under FRCP Rule 56(h) should be denied as there has been no showing of bad faith or "egregious" conduct attributable to the undersigned.

---

[7] Under the logic presented by Defendants, the only way to have avoided a Rule 56(h) motion would have been to present the Court with an actual sham affidavit that directly mirrored the mistaken allegations contained in the complaint in this action.

## SANCTIONS ARE NOT WARRANTED UNDER
## 28 U.S.C. § 1927 OR THE COURT'S INHERENT POWER[8]

23.     Under section 1927, a court may require any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously . . . to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. A court may also "exercise its inherent power to sanction a party or an attorney who has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" Ransmeier v. Mariani, 718 F.3d 64, 68 (2d Cir. 2013) (quoting Chambers v. NASCO, Inc., 501 U.S. 32 (1991)).

24.     To impose either of these sanctions, "a court must find clear evidence that (1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith — that is, 'motivated by improper purposes such as harassment or delay.'" Eisemann v. Greene, 204 F.3d 393, 396 (2d Cir. 2000) (quoting Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323, 336 (2d Cir. 1999)). A claim is entirely without color "lacks any legal or factual basis." Sierra Club v. United States Army Corps of Eng'rs, 776 F.2d 383, 390 (2d Cir. 1985) (citing Nemeroff v. Abelson, 620 F.2d 339, 348 (2d Cir. 1980)). A colorable claim, however, "has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim." Nemeroff, 620 F.2d at 348. Under either the court's inherent authority or section 1927, bad faith may be inferred "'only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay.'"

---

[8] It should be noted that Defendants are the only parties that have paid sanctions in the form costs incurred by Plaintiff for Defendants failure to appear at their depositions which were noticed months before they took place. And they did so only in the face of the Court informing the parties that it was considering assessing such costs against the Defendants. See Transcript, Docket Entry No. 97 at pp. 15:2-10.

Schlaifer Nance, 194 F.3d at 336 (quoting Shafii v. British Airways, PLC, 83 F.3d 566, 571 (2d Cir.1996) (quotations omitted). "The court's factual findings of bad faith must be characterized by 'a high degree of specificity.'" Milltex Indus. Corp. v. Jacquard Lace Co., 55 F.3d 34 (2d Cir. 1995) (quoting Oliveri v. Thompson, 803 F.2d 1266, 1272 (2d Cir. 1986) (quotations omitted)). Moreover, "[b]ecause of the importance of legitimate zealous advocacy, and because § 1927 sanctions are punitive in nature, courts should strictly construe the statute." Wolters Kluwer Fin. Servs. Inc. v. Scivantage, 525 F.Supp.2d 448, 538 (S.D.N.Y. 2007) (citing Braley v. Campbell, 832 F.2d 1504, 1512 (10th Cir.1987) (en banc)).

> *Sanctions are not warranted as the Court has already summarily dismissed any claim for sanctions related to the amended complaints.*

25.  Defendants attempt to rehash his previous motions filed in this case to establish sanctionable conduct. With respect to the amended complaints, the Court previously either addressed any misunderstandings or summarily dismissing Defendants' request for sanctions.

26.  Defendants initially moved for sanctions related to the amended complaints. See Letter from Tobias Zimmerman, Docket Entry No. 67 at p. 4. At the Status Conference on December 15, 2014, the Court summarily dismissed Defendants' request for sanctions. See Transcript, Docket Entry No. 75 at p. 29:5-6. Furthermore, at the following conference on January 21, 2015, the Court again addressed Defendants' concerns regarding what the Court stated were "communication errors". See Transcript, Docket Entry No. 85 at p. 2:21-23.

27.  Furthermore, sanctions are not warranted related to the conspiracy and illegal stop and search claims identified by Defendants. With respect to the conspiracy claim, Defendants take issue with the fact that rather than spar with Ms. Daitz over this claim, I withdrew it. Defendants create a new rule which would have required me to fight with Ms. Daitz, rather than consider her

argument, and, if warranted, simply withdraw the claim. And that is exactly what I did – withdrew the claim in writing.

28. Defendants also takes issue with the manner in which the illegal stop and search claim was withdrawn. Defendants complains that I did not sign a stipulation withdrawing the claim, while at the same time acknowledging that this claim was dropped during the conference on July 7, 2014. See Defendants' Memorandum of Law In Support at p. 8. While Defendants claims this resulted in Defendants incurring fees, a cursory review of Defendants' motion to dismiss makes it evident that all Mr. Zimmerman, Defendants' attorney, did related to this claim was simply remind the Court that this claim was withdrawn both in writing and verbally. See Memorandum of Law, Docket Entry No. 54 at Point II, p. 9. Simply put, withdrawal of these claims "does not support the kind of bad faith plot [Defendants] describes in [their] papers." Rates Tech. Inc. v. Broadvox Holding Co., 13 Civ. 0152 (SAS) at *29 (S.D.N.Y. Oct. 7, 2014) (annexed hereto as Exhibit 12).

*There is no other basis for sanctions*

29. Defendants continue their cherry picking of snippets from transcripts, alleging that Plaintiff's discovery demands are the basis for sanctions. What he fails to disclose is that each and every interrogatory and document request was objected to by Defendants. See Discovery Responses, Docket Entry No. 90-5. Furthermore, the Court subsequently overruled almost every objection Plaintiff requested a review of. See Status Conference Transcript, Docket Entry No. 101 at pp. 25-33.[9] While Defendants complain that none of the documents that were disclosed in

---

[9] Prior to this conference, the Court requested that Plaintiff review his requests and determine which were of the most important for the Court to rule on. See Docket Entry No. 97 at 16:14-18.

response to the Court's order were used on summary judgment, that argument is of no moment as there is no requirement that discoverable information also be admissible in evidence. See FRCP Rule 26(b)(1) (stating that information within this scope of discovery need not be admissible in evidence to be discoverable).[10]

30.     As to Mr. Zimmerman's contention that I accused him of wrongfully obtaining documents, he seems to forget that he was the person that attempted to reshape my argument into one of whether he wrongfully obtained documents. See Telephone Conference Transcript, Docket Entry No. at pp. 9:6 – 10:13 (the Court correctly setting forth Mr. Zimmerman's argument and the undersigned's argument). My response was attempt to dispel any notion that Mr. Zimmerman's argument was not mine, and was as the Court had stated.

31.     While Defendants attempt to reshape the history of this case to show that the undersigned has ill feelings towards the Office of the Corporation Counsel,[11] it is Defendants' "throw enough mud at the wall, see if it sticks" approach to this instant application, for sanctions,

---

[10] While Defendants complain about the number of document requests, his office's conduct, as well as the NYPD's methods of recordkeeping have necessitated the manner in which documents are requested. First, when broader language, as opposed to specific document names, is used, members of Mr. Zimmerman's office regularly do not produce relevant documents, and then later state that my office never requested a particular document. Further, the NYPD also maintains many records which are similar in nature, but are different documents. See, e.g., Deposition Transcript of Defendant Quilty, annexed hereto as Exh. 9 at p. 50:10-23 (stating that an unspecified document he reviewed generally had the same information as a SPRINT report and ICAT). Even where, in a particular matter, a document turns out to be of little value, members of the NYPD regularly use the various documents at issue as scratch paper to take notes relevant to the action. See, e.g., Prisoner Pedigree Card, annexed hereto as Exh. 10 (personal information on non-party redacted); Court Attendance Record (personal information on non-party redacted).

[11] See Defendants' Memorandum of Law, Docket Entry No. 126 at p. 10 n. 8.

as well as personal attacks on the undersigned, that is rather instructive on any alleged antagonism, and from whom it emanates.[12]

32. Also annexed hereto as Exhibit 4 is a Criminal Justice Agency Report for Mr. Jimenez which was exchanged during discovery in this matter and bears Bates Stamp No. P 3.

Dated: New York, New York
November 6, 2015

By: /s/
Gregory P. Mouton, Jr., Esq.
Law Office of Gregory P. Mouton, Jr., LLC
*Attorney for Plaintiff Patricio Jimenez*
305 Broadway, 14th Floor
New York, NY  10007
Phone & Fax: (646) 706-7481
greg@moutonlawnyc.com

---

[12] To the extent that any of Defendants' allegations remain unanswered herein, I deny such accusations, and request leave of the Court to address them should the Court identify any unanswered allegations.

Index No. 14 Civ. 2994 (SAS) (FM)
_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

PATRICIO JIMENEZ,

Plaintiff,

-against-

THE CITY OF NEW YORK, DETECTIVE JAMES QUILTY, DETECTIVE MIGUEL LOPEZ, and JOHN/JANE DOE # 1,

Defendants.
_____

AFFIRMATION IN OPPOSITION & EXHIBITS
_____



**LAW OFFICE OF GREGORY P. MOUTON, JR., LLC**
Gregory P. Mouton, Jr., Esq., *Principal*
305 Broadway, 14th Floor
New York, NY  10007
Phone & Fax: (646) 706-7481